IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**LONI MORI**, Individually and as
Administratrix of the Estate of Robert
John Dean,

        Plaintiff,

        v.

**ALLEGHENY COUNTY**; **ALLEGHENY
CORRECTIONAL HEALTH
SERVICES, INC.**; **RAMON C. RUSTIN**;
**JAMES DONIS**; **DANA PHILLIPS**;
**KIMBERLY MIKE-WILSON**;
**MICHAEL PATTERSON**; **EUGENE
YOUNG**; **JANE DOE NUMBER ONE**,
an individual whose identity cannot be
determined who served as a Medical
Assistant for Allegheny Correctional
Health Services on the evening
of November 2, 2011; **SCOTT KANAGY**;
**CORRECTIONS OFFICER PATILLA**,
a female Corrections Officer employed by
Allegheny County whose first name cannot
presently be determined; **CORRECTIONS
OFFICER DAY,** a female Corrections
Officer employed by Allegheny County
whose first name cannot presently be
determined; **JOHN DOE NUMBER ONE**,
an Allegheny County Corrections Officer
whose identity cannot presently be
determined who was stationed in the "E"
female housing unit during the evening of
November 2, 2011,

        Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

2:13cv348
**Electronic Filing**

## <u>OPINION</u>

Loni Mori ("plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 seeking

redress (1) in her own right for the alleged deprivation of her constitutional rights while detained

in the Allegheny County Jail and (2) as administratrix of her deceased son for deprivation of his

constitutional rights during the same detention. Complaint at ¶¶ 1, 4, 56-59. Specifically,

plaintiff is the court-appointed administratrix of decedent Robert John Dean's estate. Id. at ¶ 5. As administratrix she advances claims that seek to enforce through section 1983 a survival action and a wrongful death action. Presently before the court is the Allegheny Corrections Health Services defendants' motion to dismiss.[1] For the reasons set forth below, the motion will be denied.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, – U.S. –, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

---

[1] Plaintiff brings her claims against the following defendants: Allegheny County ("the County"), Ramon C. Rustin, Major James Donis ("Donis"), Corrections Officer Scott Kanagy ("Kanagy"), Corrections Officer Patilla, Corrections Officer Day, and John Doe Number 1 as a Corrections Officer for the County (collectively "the County defendants"); and Allegheny Correctional Health Services, Inc. ("ACHS"), Dana Phillips ("Phillips"), Kimberly Mike-Wilson ("Mike-Wilson"), Michael Patterson ("Patterson"), Eugene Young ("Young"), and Jane Doe Number 1 as a medical assistant for ACHS (collectively "the ACHS defendants").

Id.  In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are merely consistent with a defendant's liability.  Id.  Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct.  Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8  (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)).

This is not to be understood as imposing a probability standard at the pleading stage.  Iqbal, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same).  Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides]  enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  Phillips, 515 F.3d at 235; see also  Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 235) (citations omitted).  "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Twombly, 550 U.S. at 563.

Plaintiff was brought to and detained at the Allegheny County Jail ("ACJ") on October 16, 2011. <u>Id.</u> at ¶ 21;  She was approximately seven and a half months pregnant. <u>Id.</u>  Prior to her detention she was under a physician's care for a "high risk" pregnancy and was scheduled for an ultra-sound due to her need for special medical attention and frequent monitoring of her unborn child, "especially as it related to [plaintiff's] placenta." <u>Id.</u> at ¶ 22.  ACJ made arrangements for plaintiff to be screened at a prominent medical hospital where she was admitted for 5 days; she was discharged to ACJ on October 21, 2011, with normal findings and told that ACJ officials would schedule a subsequent ultrasound. <u>Id.</u> at ¶ 23.

On November 2, 2011, plaintiff began bleeding from the vagina.  Plaintiff activated the call button in her cell and explained to officer Kanagy upon his arrival that she was pregnant, bleeding from the vagina and needed medical assistance.  Officer Kanagy responded by sarcastically telling plaintiff she would "get her methadone" and otherwise ignored her plea for help.[2]

Plaintiff made additional attempts to get medical attention throughout the day.  She requested help from officer Patilla around 3:30 p.m., explaining she was beyond seven and a half months pregnant, bleeding from the vagina, and in need of medical attention.  Officer Patilla simply told plaintiff to "tell Day" and did nothing more. <u>Id.</u> at ¶ 28.  After being transferred to another housing unit plaintiff informed officer Day that she was pregnant, bleeding from the vagina and in need on medical assistance.  Officer Day told plaintiff to "get away from my desk if you are bleeding" and did not provide any further assistance. <u>Id.</u> at ¶ 29.

Throughout the day plaintiff detected an increase in her baby's movements and an increase in her rate of bleeding; she became increasingly alarmed and upset and experienced

---

[2] Plaintiff was on methadone maintenance and had not received her daily dose that morning. <u>Id.</u> at ¶ 25.

cramping and weakness.  Id. at ¶ 30.  At 6:00 p.m. plaintiff was taken to the health clinic to

receive her dose of methadone.  Id. at ¶ 31.  She begged for medical attention, explaining that she

was more than seven and a half months pregnant, had a "high risk" pregnancy, was bleeding

throughout the day, the bleeding was increasing, she was experiencing weakness and cramping,

and her fetus appeared to be in distress.  Id. at ¶ 32.  She was told that "if [she] did not fill up a

couple of pads she had to go [back down to her housing unit]."  Id.

     Plaintiff's bleeding increased during the evening hours.  She pressed the call button in her

cell and was then told that if she continued to do so she would be "locked in" in her own cell.  In

the middle of the night the correction officer responding to the call did call the infirmary on

plaintiff's behalf, did not receive an answer and left a message on the answering system.  Id. at ¶

34.  On information and belief, the message intentionally was ignored.  Id. at ¶ 35.

     Plaintiff's pain and bleeding continued through the morning on November 3, 2011, but

her fetus had stopped moving.  She was taken to the infirmary and had to wait over an hour while

other routine medical care was dispensed to other inmates.  After Doctor Young saw plaintiff he

directed that she be transported to the hospital immediately.  He did not indicate the situation

constituted a medical emergency.  Plaintiff was taken to a holding cell where she remained for

45 minutes and then transported in a police cruiser instead of an ambulance.  During this entire

time plaintiff was not examined or given medical attention.  Id. at ¶¶ 36-37.

     At the hospital plaintiff was informed that she had suffered a placental abruption.[3]  Id. at

¶ 37.  Plaintiff was seen in triage and initially treated with medication, which brought her

---

[3] Plaintiff avers: "Bleeding from the vagina during the last trimester of a pregnancy is well
known, in both the medical and lay community, as being a serious medical condition that
requires immediate medical attention for the health of the mother and her unborn child.  Bleeding
during the last trimester is usually associated with placenta previa or placental abruption, both of

increased pelvic pressure under control.  Exhibit 1 to Supplemental Affidavit (Doc. No. 52-1).[4]

She then experienced increased pelvic pressure, which culminated in full dilation with fetal parts

appearing in the vagina.  The fetus presented in footling breach position and was delivered using

breach maneuvers.  At this time "all four limbs were moving spontaneously."  The infant's head

then became "entrapped in [the] cervix which had reclamped down on part of the fetal head.

After several minutes, the cervix was swept away from the head" and the birth was completed.

Id.  The "infant had heart tones in the 60s after completion of [the] delivery."  Id.

Plaintiff was thirty-three weeks along in her pregnancy on November 3, 2011, with an

estimated due date of December 21, 2011.  Id. at Exhibit B (Doc. 52-1).  Prompt medical

attention on November 2, 2011, would have prevented the birth in distress and subsequent death

of the infant, which was "viable on the date of his death."  Amended Complaint at ¶¶ 37-39.

Plaintiff has suffered severe emotional distress as well as other damages as a result of the loss.

Id. at ¶¶ 38, 57, 59.

The failure to provide medical care was the result of a custom or practice that developed

at the Allegheny County Jail ("ACJ").  The practice was designed to deprive inmates of medical

care, and particularly outside medical consultation and treatment, in order to save money.  The

practice started after Major Donis conducted an audit that focused on the number and costs of

outside medical trips, which led to Dana Phillips instituting a policy that all outside medical

treatment had to be approved by her.  At times Ms. Phillips, who is an occupational therapist,

---

which are serious medical conditions.  Placental abruption can, when left untreated, cause death
to both mother and child, and a range of other life-threating complications."  Id. at ¶ 27.
[4]  This exhibit was submitted as part of plaintiff's opposition to defendants' motion to dismiss.
*See* Supplemental Affidavit of Elmer Robert Keach, III, Esquire (Doc. No. 52).  Because the
exhibit is verified as being plaintiff's part of plaintiff's medical records and is an integral part of
the allegations of plaintiff's amended complaint, the court has treated it as an exhibit to the
amended complaint.

"overruled the directions of physicians employed by ACHS regarding the need for ACJ inmates to receive outside medical care." Id. at ¶40a.  This practice had several ramifications, including an atmosphere that discouraged doctors and ACJ staff from instituting measures that would lead to outside medical consultation and treatment.  Sick call slips often were not collected or otherwise were not addressed.  Telephone calls were left to go to voicemail and then ignored and deleted.  Correction officers who did reach the infirmary were often denigrated for undertaking efforts to obtain medical care for inmates.  There was no formal written policies pertaining to a host of issues including the triage of inmates, calls from housing units, and the hierarchy of responsibility between doctors and staff in making decisions about inmate health care.  The practice also sought to suppress documentation of any problems or shortcomings in the provision of care to inmates.  There was no coherent policy or practice pertaining to the medical needs of female inmates, especially those who were pregnant.  Id. at ¶¶ 40b-40h.

All defendants allegedly violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by ignoring her serious medical condition and refusing to provide her with appropriate, necessary medical treatment, thereby evincing a deliberate indifference to her serious medical needs.  Id. at ¶ 49.  These actions and inactions ultimately led to plaintiff experiencing prolonged suffering and caused the death of her son.  Id. at ¶ 50.  The County and ACHS are directly responsible for this violation through the actions of their policymakers.  Id. at ¶ 51.

The ACHS defendants move to dismiss on several grounds.  The supervisors of ACHS contend that plaintiff has failed to state a claim of deliberate indifference against them because they did not have contact with or treat plaintiff with regard to her specific requests for medical care; and Doctor Young did see plaintiff on the morning of November 3, 2011, and sent her out for medical care, thereby negating any contention that he was indifferent to her medical needs

and eliminating a basis for liability.  The bases advanced in paragraphs 40 and 41 of the amended complaint advance inflammatory allegations concerning the purported creation of customs and practices that have nothing to do with and are unrelated to the provision of health care to plaintiff.  And at best they paint a scenario predicated on respondeat superior liability and fall woefully short of supplying a factual predicate to support the element of causation.

Finally, these defendants assert that the attempt to recover damages pursuant to Pennsylvania's Survival and Wrongful Death Act via § 1983 fails because a plaintiff must be a "person" in order to gain the protections afforded by the Fourteenth Amendment and the Supreme Court recognized in Roe v. Wade, 410 U.S. 113, 158 (1973), that the term "person" as used in the Fourteenth Amendment does not include the unborn.  Thus, plaintiff cannot establish that the minor child was a "citizen" entitled to invoke the remedies offered through 42 U.S.C. § 1983.

Moving defendants' contention that the amended complaint falls short of providing a short and plain statement setting forth a plausible claim for relief against each defendant predicated on a violation of the Eighth Amendment falls short of the mark.  Defendants' arguments are in large measure predicated on an artful construction of the amended complaint and a demand for evidentiary proof at the pleading stage.  Of course, the applicable standard of review does not permit the court to follow their lead and therefore we must decline to do so.

Moreover, the allegations set for a plausible showing of entitlement to relief against the individual AHCS defendants for supervisory liability under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), and for individual liability against Dr. Young.  Finally, a factual basis has been advanced to support a plausible showing that the child was a person within the meaning of the Fourteenth Amendment at the moment of his death. Consequently, defendants' motion must be denied.

In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right.[5] Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person acting under color of law deprived him of a federal right." ) (citing Groman, 47 F.3d at 633). It is not contested that the defendants were acting under color of state law.

In any § 1983 claim, "the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998) (citations omitted). Plaintiff avers that defendants violated her rights under the Eighth Amendment by ignoring her serious medical needs and refusing to provide her with appropriate and necessary medical treatment. Amended Compl. at ¶ 49. Plaintiff's survival and wrongful death claims are predicated on a violation of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 & n. 16 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be

---

[5] Section 1983 creates liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

9

punished prior to an adjudication of guilt in accordance with due process of law."); Stevenson v. Carroll, 495 F.3d 62, 67 (3d Cir. 2007) ("With respect to the substantive due process claims of punishment, in Bell v. Wolfish, the Supreme Court established the principle that 'under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.'"); Carson v. Mulvihill, 488 F. App'x 554, 559 (3d Cir. 2012) (Under Bell, pretrial detainees may not be punished prior to an adjudication of guilt in accordance with due process of law.)

Plaintiff bears the burden to allege a predicate basis from which findings on the objective components of the Eighth Amendment can be made. Newlon v. Achute, 932 F. Supp. 529, 532 (S.D. N.Y. 1996); Pasha v. Barry, No. Civ. A. 96-466, 1996 WL 365408, *1 (D.D.C. June 21, 1996). The claim has two areas of focus: (1) deliberate indifference by prison officials to (2) a serious medical need. Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987). Mere allegations of mistreatment or a disagreement over the proper course of treatment will not suffice. Id.

In Estelle v. Gamble, the Court held that there is an obligation for the government to "provide medical care for those whom it is punishing by incarceration." Estelle, 429 U.S. 97, 103-04 (1976) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976) (joint opinion)). Estelle requires a showing of "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" in order to establish an Eighth Amendment violation. Estelle, 429 U.S. at 106. Accordingly, averring facts that raise an inference of being deliberately indifferent to a prisoner's serious illness or injury states a cause of action under 42 U.S.C. § 1983. Estelle, 429 U.S. at 105.

"A medical need is 'serious,' in satisfaction of the second prong of the Estelle test, if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that

a lay person would easily recognize the necessity for a doctor's attention.'" Monmouth County Correctional Institutional Inmates, 834 F.2d at 347 (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D. N.J. 1979), aff'd, 649 F.2d 860 (3d Cir. 1981)). Reference to the effect of the denial of a particular treatment may be used to determine the seriousness of an inmate's medical need. Estelle, at 103. Also, if the "unnecessary and wanton infliction of pain" results from the denial or delay of adequate medical care, "the medical need is of the serious nature contemplated by the Eighth Amendment." Id.

In Farmer v. Brennan, 511 U.S. 825, 837 (1994), the Court explained that the term "deliberate indifference" lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." 511 U.S. at 836. It instructed that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; that is, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

511 U.S. at 837 (citing Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979), aff'd, 649 F.2d 860 (3d Cir.1981); accord Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H. 1977)).

The denial of a reasonable request for medical treatment that results in "undue suffering or the threat of tangible residual injury" can support a finding of deliberate indifference. Monmouth County Correctional Institutional Inmates, 834 F.2d at 346 (citing Westlake v. Lucas, 537 F.2d 857, 860 (6th Cir.1976)). Similarly, knowledge of the need for medical care accompanied by the intentional refusal to provide that care will support such a finding. Id. (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir.1985) and Robinson v. Moreland, 655 F.2d 887, 889-90 (8th Cir.1981) (jury could properly conclude that provision of ice-pack for inmate's fractured hand constituted deliberate indifference where prison guard knew medical care was needed)). And in the absence of denial, "if necessary medical treatment [i]s . .

11

. delayed for non-medical reasons, a case of deliberate indifference has been made out." Id.

(quoting Ancata, 769 F.2d at 704 and Archer v. Dutcher, 733 F.2d 14 (2d Cir. 1984) (allegation

that emergency medical care to pregnant inmate was delayed in order to make her suffer stated a

claim of deliberate indifference under Estelle). In addition, deliberate indifference can be

demonstrated "[w]hen … prison authorities prevent an inmate from receiving recommended

treatment for serious medical needs or deny access to a physician capable of evaluating the need

for such treatment." Id. (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762

(3d Cir. 1979)).

Conversely, mere negligent misdiagnosis or treatment is not actionable because medical

malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities

are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer v.

O'Carroll, 991 F.2d 64, 67 (3d Cir. 1990). It follows that prison medical staff decisions

involving the exercise of professional judgment do not violate the Eighth Amendment merely

because they constitute medical malpractice. Id. at 107; see also Farmer, 511 U.S. at 835

(reiterating Estelle's distinction between deliberate indifference to serious medical needs and

"mere negligence"); Durmer, 991 F.2d at 67 (acknowledging that a deliberate indifference claim

requires that a prisoner demonstrate "more than negligence"). Likewise, "mere disagreement as

to the proper medical treatment" is insufficient in establishing a constitutional violation.

Monmouth, 834 F.2d at 346 (citing Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir.1977); Massey

v. Hutto, 545 F.2d 45, 46 (8th Cir. 1976) (per curiam)).

Our Court of Appeals has identified several other scenarios that satisfy Estelle, such as

"[w]here prison authorities deny reasonable requests for medical treatment . . . and such denial

exposes the inmate to undue suffering or the threat of tangible residual injury," Monmouth, 834

F.2d at 346 (internal quotation omitted), or "where 'knowledge of the need for medical care [is

accompanied by the] ... intentional refusal to provide that care.'" Thomas v. Dragovich, 142 F. App'x. 33, 36-37 (3d Cir. 2005) (quoting Monmouth, 834 F.2d at 346). Similarly, if "deliberate indifference caused an easier and less efficacious treatment" to be provided, a defendant will have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care. West v. Keve, 571 F.2d 158, 162 (3d Cir. 1978) (citing and quoting Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974)); see also Estelle, 429 U.S. at 104.

Here, defendants' contentions as to Dr. Young are predicated on a selective reading of the complaint. Plaintiff specifically alleges that while Doctor Young did see her on the morning of November 3, 2011, and directed that she be taken to the hospital, he did not conduct any medical examination, monitor her fetal heart rate or take any vital statistics from her or her unborn child. He did not advise that her situation required immediate medical transport or transportation by ambulance. This scenario plausibly sets forth enough factual matter to suggest by inference that the required element of deliberate indifference is present and it raises a reasonable expectation that discovery will reveal evidence of that element. Furthermore, defendant Young does not account for these allegations and reasonable inferences in the moving defendants' briefing, and their contention that Dr. Young actually provided treatment to plaintiff is less than accurate under plaintiff's allegations. Consequently, whether plaintiff's proof against Dr. Young ultimately will amount to something short of deliberate indifference must await development of the record and summary judgment.

Moving defendants' contentions that the amended complaint does not contain factual allegations sufficient to set for a plausible showing of liability under Monell equally is wide of the mark. Whether a municipal entity may be held liable under § 1983 is governed by the doctrine announced in Monell. There, the Supreme Court held that liability against such an entity may not be established by the respondeat superior doctrine, but instead must be founded

13

upon evidence indicating the government itself supported a violation of the plaintiff's constitutional rights. Id. at 694; see also Bielevicz v. Dubinon, 915 F.3d 845, 849-50 (3d Cir. 1990) ("municipal liability attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'") (quoting Monell, 436 U.S. at 694).

Proving a government policy or custom can be accomplished in a number of different ways. Bielevicz, 915 F.2d at 850. "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Custom, in contrast, can be proven by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well-settled and permanent as virtually to constitute law. Id. (citing Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, 42 U.S. 919 (1989)).

Here, the alleged policy is sufficiently identified. Plaintiff alleges that a custom and practice developed of not providing adequate medical care to detainees, particularly where that medical care involved services from outside providers. The custom and practice was grounded in an intent to save money. Amended Complaint (Doc. No. 32) at ¶¶ 36-41, 51-52. Defendant Phillips instituted a policy requiring all outside medical treatment be approved by her. At times she "overruled the directions of physicians employed by ACHS regarding the need for ACJ inmates to receive outside medical care." Id. at ¶40a. This practice fostered an atmosphere where doctors and ACJ staff were discouraged from instituting measures that would lead to outside medical consultation and treatment; sick call slips often were not collected or otherwise were unaddressed; telephone calls were answered by voicemail and the messages were ignored

and deleted; correction officers reaching the infirmary were denigrated for undertaking efforts to obtain medical care for inmates; and no formal written policies were developed with regard to numerous areas of medical treatment, including the triage of inmates, calls from housing units, and the hierarchy of responsibility between doctors and staff in making decisions about inmate health care. The practice also sought to suppress documentation of any problems or shortcomings in the provision of care to inmates. There was no coherent policy or practice for dealing with the medical needs of female inmates, especially those who were pregnant. Id. at ¶¶ 40b-40h.

A factual basis supporting a plausible showing of causation also is present. Defendants assert that there is no basis for concluding that many of the averred manifestations of the alleged practice had any causal relation to plaintiff suffering the separation of the placenta from her uterus, and consequently these allegations are irrelevant and scandalous and should be stricken. But this position fails to account for the reasonable inference that the identified manifestations contributed to the alleged spurning of plaintiff's repeated requests for medical assistance throughout the day on November 2, 2011, the inability of the John Doe officer to get plaintiff assistance from the infirmary that night, and the lackadaisical response to Doctor Young's indication that plaintiff was to obtain outside medical care. While more ultimately may be required to prove actual causation, the sufficiency of the available evidence and the applicable burdens of proof are not standards that govern the sufficiency of a complaint.

Moreover, plaintiff has alleged that "had prompt medical attention been provided to [plaintiff] when she started bleeding on November 2, 2011, her son would be alive and with her today." Amended Complaint at ¶ 35. Construed in context and in conjunction with the

allegations of custom and practice, this factual assertion is sufficient to supply a plausible basis for causation and any further evaluation must await full development of the record.[6]

The individual defendants' efforts to avoid liability for any alleged unconstitutional custom and/or practice is unavailing. "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" A.M. ex re. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 586 (3d Cir. 2004) (quoting Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 725 (3d Cir.1989)). Phillips was the chief operating officer of ACHS. Mike-Wilson was a nursing supervisor and senior policy maker for ACHS. And Patterson was the chief medical officer of ACHS and a senior policy maker. Plaintiff alleges that each assisted in implementing

---

[6] Defendants also seek to strike plaintiff's allegations in paragraphs 40 through 43 on the basis that they are derived from discovery in other litigation and/or contain inflammatory allegations such as the ACJ had a high death rate and ACHS ran a "death factory." Federal Rule of Civil Procedure 12(f) permits a court to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." McInerney v. Moyer Lumber and Hardware, Inc., 244 F. Supp.2d 393, 402 (E.D. Pa.2002) (citation omitted). Motions to strike under Rule 12(f) are committed to the discretion of the district court, but will usually be denied unless the allegations have no possible relation to the controversy, will cause prejudice, or will confuse the issues in the case. Adams v. County of Erie, Pa., 2009 WL 4016636, at *1 (W.D. Pa. Nov. 19, 2009) (McLaughlin, J.) (citations omitted).

While plaintiff's averments do contain a number of characterizations by counsel that are not allegations of fact, each of these characterizations is accompanied by assertions of fact that have the potential to be used as proof pursuant to a Monell custom and practice claim. The origin of these facts does not detract from their potential relevance or raise a fatal bar to their use. Furthermore, in the event the matter proceeds to argument on any given motion or to trial, counsel is entitled to wide latitude in characterizing what the evidence does or does not reveal. Thus, the pleadings merely serve to alert defendants to plaintiff's plans to employ these characterizations and there does not appear to be a sound basis for striking them at this juncture.

Of course, whether any particular characterization may be advocated in any particular setting other than the instant one is beyond of the scope of the court's current review.

measures that were designed to curtail medical costs following Major Donis' audit and directive

to reduce such costs.  These included Phillip's institution of a policy requiring her approval for

all outside medical care even though it was ordered by a physician and initiation of discipline

against individuals complaining about or documenting the lack of needed medical care for

inmates.  Mike-Wilson assisted in implementing the practice with regard to nurses who wrote

incident reports about sick call slips not being collected and/or incorporated those or similar

incidents into inmates' medical records.  And as chief medical officer for ACHS, Patterson

necessarily joined and acquiesced in these aspects of the alleged practice.  Consequently,

plaintiff is entitled to proceed with this aspect of her <u>Monell</u> claims against these individuals.[7]

Finally, moving defendants' assertion that plaintiff cannot pursue the survival and

wrongful death claims is misplaced.  Defendants rely on a line of authority exemplified by

<u>Harman v. Daniels</u>, 525 F. Supp. 798 (E.D. Va. 1981), and <u>Romero v. Gonzalez Caraballo</u>, 681

F. Supp. 123 (D. P.R. 1988.  Each case involved a claim by a child predicated on the use of

excessive force against the child's mother during an arrest and while she was carrying the child

---

[7]  Moving defendants seize on the lack of a factual basis to infer that they made direct decisions regarding plaintiff's need for medical care.  This form of supervising liability attaches when such an individual specifically "participated in violating [] plaintiff's rights, directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations."  <u>Id.</u>  (citing <u>Baker v. Monroe Township</u>, 50 F.3d 1186, 1190-91 (3dCir. 1995)).  Pleading such a claim requires a factual basis that raises an inference that the supervisor participated in the violation, or directed his or her subordinates to violate the plaintiff's constitutional rights, or had knowledge that they were in the process of doing so and acquiesced in the offending course of conduct.  <u>Santiago v. Warminster Township</u>, 629 F.3d 121, 130 (3d Cir. 2010).

Plaintiff has not raised any facts to support an inference that any of the supervisory officers had any personal involvement in the specific decisions or inaction(s) of their subordinates and/or the correction officers pertaining to plaintiff's requests for medical care.  And a review of plaintiff's brief in opposition makes clear that plaintiff does not purport to advance a claim on this basis.  Because the complaint does not even seek to set forth a plausible claim for relief under this theory of supervisory liability, defendants' efforts to gain dismissal by defeating this theory is misplaced.

in utero.  The use of excessive force was alleged to have caused injury to the child resulting in the need for long-term medical care.  Each court held that the claim accrued when the wrongful act, the alleged punch in <u>Harman</u> and the alleged beating in <u>Romero</u>, took place.  <u>Harman</u>, 525 F. Supp. at 800; <u>Romero</u>, 681 F. Supp. at 126.  Each court held that a fetus in utero is not a person under the Fourteenth Amendment or a citizen under § 1983, and thus a § 1983 claim cannot be predicated on the rights of the unborn.

In <u>Harman</u>, the minor child claimed that the defendant police officer violated her rights when he struck the child's mother in the stomach and then refused to obtain medical assistance for the mother.  The court held that the claim accrued at the time of the punching and refusal to summon help.  The court then relied on <u>Roe v. Wade</u> for the proposition that "the word 'person' as used in the Fourteenth Amendment does not include the unborn" and reasoned that as of that date no court had held that a fetus was a "person" within the meaning of the Civil Rights Act. <u>Harman</u>, 525 F. Supp. at 800 (quoting <u>Roe v. Wade</u>, 410 U.S. at 158).  It further reasoned that Congress could enact this type of protection for the unborn, but had not done so.  <u>Id.</u> at 801.  It also found that the fact that the child was alive when the lawsuit was commenced was "a distinction without a difference."  It opined that "[t]he fact that a fetus may be capable of sustaining life in the future does not have any affect upon the availability of remedies under Section 1983."  <u>Id.</u>  It thus aligned itself with "with the few cases in which courts have determined that the ipse dixit in <u>Roe v. Wade</u> precludes relief for constitutional deprivations sought on behalf of a child in utero under Section 1983" and concluded that the plaintiff was not a "citizen" within the meaning of Section 1983 when the alleged injury occurred, because the Fourteenth Amendment limits citizenship to persons "born . . . in the United States."  <u>Id.</u> (citation omitted).

18

The court in <u>Romero</u> reached the same conclusion.  There, the mother had been arrested and allegedly beaten by police when she was in her ninth month of pregnancy.  She advanced various claims of unlawful force and retaliation and her minor child, who was born a few weeks after the incident, brought a separate claim for the injuries he sustained while in utero.  Following the rationale in <u>Harman</u>, the <u>Romero</u> court granted a motion to dismiss, reasoning that on the night in question the minor child was not a "person" within the meaning of the Fourteenth Amendment.  <u>Romero</u>, 681 F. Supp. at 126.

The court in <u>Douglas v. Town of Hartford</u>, 542 F. Supp. 1267 (D. Conn. 1982), reached the opposite conclusion.  There, the mother was five and a half months pregnant when she allegedly was beaten by police officers.  She, and her minor child who was born three months later, filed  § 1983 claims.  The <u>Douglas</u> court acknowledged that several courts had ruled in varying contexts that a "fetus" was not a person within the meaning of § 1983, but nevertheless denied a motion to dismiss on the grounds that "'recent and well-established trends in the state courts, including those in Connecticut, have expanded the legal rights of the viable fetus in a wide variety of contexts."  <u>Id.</u> at 1270.

A separate line of authority has evolved in more recent times.  In <u>Crumpton v. Gates</u>, 947 F.2d 1418 (9th Cir. 1991), the six year old son of a man killed by police officers when the child was a two-month old fetus brought a § 1983 action based on the loss of the father's companionship.  The child alleged that his father had been executed by a Los Angeles Police Department death squad, which assertedly followed criminals who were escaping the arm of the law, permitted them to commit crimes and then executed them on the pretext that they were dangerous criminals in the act of escaping.  <u>Id.</u> at 1419.  The district court granted the defendant officer's motion for summary judgment on the ground that the plaintiff was not a "person" within

the meaning of the Fourteenth Amendment or a citizen under § 1983 and relied on Roe v. Wade to support its disposition. Id. at 1420.

The Ninth Circuit reversed, holding that Crumpton's injury and cause of action for deprivation of familial companionship and society did not arise until his birth and thus "even under the most restrictive view of the scope of section 1983, he is entitled to proceed as a proper party in his federal civil rights suit." Id. at 1423, 1424. In reaching its decision, the court noted its precedent in Smith v. City of Fontana, 818 F.2d 1411 (9th Cir.), cert. denied, 484 U.S. 935 (1987), that the Civil Rights Act was intended to provide survivors of racially motivated violence with "a remedy for their own constitutional injuries occasioned by the wrongful killing of a parent" and found that Crumpton had advanced a deprivation of "constitutional proportions." Id. at 1421.

In grappling with the question of who may bring a suit under § 1983, the court observed that the notion that a fetus is not a person entitled to assert a cause of action "has been limited to the 1983 context" and that "many states provide causes of action for injury to a viable fetus, regardless of whether it is later born alive." Id. at 1421 n. 2 (citing Himes v. Clinton, 792 P.2d 1032, 1036 (Kan. 1990)); accord Harvard v. Punter, 600 F. Supp.2d 845, 853 (E.D. Mich. 2009) (noting the extensive criminal law protection extended to fetuses in 36 states and by the Unborn Victims of Violence Act of 2004 codified at 18 U.S.C. § 1841(c)(1)). It distinguished Harman and Romero on the ground that those plaintiffs' injuries were complete at the moment of the wrongful act: the physical attack which injured the fetus.[8] Id. at 1422. It further expressed "grave doubts about the Harman court's proposition that infants injured in utero and later born alive simply must bear their federally cognizable afflictions without the hope of remedy." Id. at

---

[8]Curiously, no evidence to prove or disprove this proposition was discussed in either Harman or Romero. Instead, the factual determination was nothing more than a judicial declaration.

1423 n. 6. It then noted that while the asserted violation of Crumpton's father's constitutional rights occurred when he was shot, an injury to Crumpton's constitutional rights "did not occur immediately upon the commission of the wrongful act, the father's killing." Id. at 1422. Instead, the court reasoned that "[b]ecause a child has familial relationships only after birth, it follows that the child's right to familial relationships exists only after birth." It further highlighted a substantial body of law recognizing that where the injury to an individual does not occur at the moment of the wrong act, causes of action under remedial statutes and the common law have been construed to arise when the injury occurs. Id. at 1422-23. Because Crumpton's injury could not have occurred until his birth and thus his § 1983 action could not have been brought until that time, the court "reverse[d] the summary judgment, which was based on Crumpton's status as a fetus when his father was killed." Id. at 1424.

In Havard v. Puntuer, 600 F. Supp.2d 845 (E.D. Mich. 2009), aff'd 436 F. App'x 451 (6th Cir. 2011), the guardian of a female minor child brought a § 1983 claim on behalf of the minor who had been born in a county jail while her mother was incarcerated there. The minor child had suffered injuries with serious and long-term repercussions during and after the birthing process. Id. at 847. The mother had gone into labor at 3:00 a.m., was left in her cell until 9:28 a.m., and taken to the hospital and monitored until 11:28 p.m., when the physician directed that she be returned to the jail. Upon her return, the mother was returned to her cell. Her labor pains intensified and she notified defendant Puntuer of this and her need for medical attention. Over two hours passed without the mother being checked on. She was then brought to the nurses station, but the nurse did not provide any medical care. She was returned to her cell. The mother asked her cellmate to alert the staff that she was in need of immediate medical attention, but the cellmate was unable to get the attention of the guards. All of the inmates began screaming and banging on the toilets and cell bars, but the defendants again failed to respond.

21

Shortly before 1:30 a.m. the defendants did respond to the ongoing noise and asked the mother what was going on. She said the baby was coming out. They ordered her to stand and get dressed, but she said she could not move because the baby was coming out. The defendants placed her in a wheelchair and transported her to the nurses station, where the on duty nurse notified EMS but did not perform any medical assessment, make any diagnosis or render any care.

When EMS arrived they realized the baby's head was crowning or had already crowned. The baby was then delivered within minutes. The child was not breathing and the equipment needed to resuscitate the baby was not available, so EMS transported the mother and baby to the nearest hospital. At the hospital the baby was found to be cyanotic, with no respirations or heart rate. She was intubated and CPR was performed. She allegedly suffered from mental retardation and severe cerebral palsy as a result. Id. at 849.

The defendants moved to dismiss, arguing that the essence of the plaintiff's claims was that defendants denied a fetus medical care, and as reflected in Harman and Romero, a fetus was not a person under Roe v. Wade and therefore the protection of the Fourteenth Amendment was unavailable. Id. at 850-51. The district court rejected this position as a request for unwarranted "legal line drawing" and followed the ruling in Crumpton, which it found to be "highly persuasive." Id. at 854. It opined:

> Applying the ruling in Crumpton to these facts, the complaint states a claim that Barker's injuries were sustained during the time period following her birth, while she was transported to the hospital, and that the cause of her injuries was the lack of adequate medical care during and immediately after birth. The defendants had sufficient warning that the child was on the way and did not get her the medical care she needed immediately prior to, during, and after her birth. On these facts, a jury could conclude that because of the defendants' deliberate indifference to Chelsie Barker's serious medical needs, she was not in a hospital at the time of her birth, the physicians and the facilities of the hospital were not available to resuscitate her when she was born, and she was not resuscitated until she arrived at the hospital.

Id. at 855.  It further found that the minor child was a person entitled to invoke the protections of the Fourteenth Amendment, her injuries were not instantaneous but of a continuing nature, and the minor child could recover for injuries sustained prior to, during and after birth.  Id.  It reasoned and held: " Because the injury was a continuous one, and given the Court's finding that she is entitled to maintain an action under Section 1983, there is no principled reason to distinguish those injuries sustained before the birth from those sustained after birth."  Id.

The United States Court of Appeals for the Sixth Circuit upheld the lower court's rulings. Harvard v. Wayne County, 436 F. App'x 451 (6th Cir. 2011).  It rejected the defendants' contention that the minor was not a person under the Fourteenth Amendment on the grounds that the plaintiff had alleged the lack of adequate medical at the time of the child's live birth and thereafter, all of which were "points at which Chelsie was certainly a 'person' in the eyes of federal constitutional law." Id.  at 454.

The Sixth Circuit similarly rejected the notion that the defendants had no constitutional duty to provide medical care to the child.  Defendants had assumed that duty upon the child's birth.  And the objective and subjective components of a constitutional claim for denial of medical care were present: pregnancy and the potential birth of a child always present risks of significant magnitude and give rise to a serious medical need requiring appropriate "personnel and resources to handle pregnancy-related emergencies, such as those which had arose in [the] case." Id.  The subjective component was sufficiently pled because the mother was at least seven months pregnant upon entering the jail, complained of labor pains for several hours, became dilated, told defendants the baby was coming out and defendants failed to provide any medical care or take her to the hospital, causing an additional 27 minute delay while waiting for EMS to arrive, who were not equipped to handle the situation.  Id. at 455.

23

The court also found unpersuasive the defendants' contention that they had no duty to anticipate the needs of the child before she was born and as a result they were entitled to qualified immunity. It opined:

> Although this argument has some logical appeal, cf. Danese v. Asman, 875 F.2d 1239, 1244 (6th Cir.1989) (holding that prison officials are not "required to screen prisoners correctly to find out if they need help"), it is simply unreasonable in the context of this case. This case presents a situation where the medical need was blatantly obvious and the medical risks were great. It takes very little foresight to anticipate that a baby will appear soon after labor begins. Holding that Defendants were required to respond to that medical need does not impose a duty on them beyond what the law already clearly establishes: prison officials cannot deliberately ignore the obvious and serious medical needs of those within—or imminently to be within—their custody.

Id. at 456. Thus, the district court properly rejected the individual defendants' defense of qualified immunity.

Turning to the matter at hand, the instant case is far more analogous to Crumpton and Havard and the contention that plaintiff's child was not a person at the time it suffered the injury resulting in its death is unavailing for a multitude of reasons. First, plaintiff has alleged that she provided notice to defendants upon being incarcerated at the ACJ that she had been carrying a child for thirty weeks and had been told by her doctor that she had a high-risk pregnancy that required special medical attention and frequent monitoring. ACJ acknowledged these risks when it sent plaintiff for screening, which resulted in a five day stay at a prominent women's hospital. Upon discharge, the hospital staff told plaintiff that ACJ would schedule an additional follow-up screening – which raises the reasonable inference that they also notified the staff at the ACJ that the follow-up ultrasound was important given the high-risk nature of plaintiff's pregnancy. Thus, defendants were on notice that plaintiff had a serious medical condition that could present significant risks to plaintiff and her child if appropriate monitoring and care were not provided.

Second, at thirty-three weeks into the pregnancy plaintiff notified various members of ACJ and ACHS that she was bleeding from the vagina and repeatedly sought medical attention

over an entire day. She notified both guards and medical assistants of her increasing bleeding and the baby's corresponding distress. Her requests were repeatedly ignored and she was belittled for requesting medical attention. When she was taken to the infirmary after 24 hours she still did not receive a medical examination or any medical care. She was taken back to a holding cell and made to wait for forty-five minutes for transportation to the hospital. That transportation was in the form of a police cruiser and not an ambulance, thereby further depriving her of any medical examination or evaluation until she arrived at the hospital. Examination at the hospital revealed placental abruption, the very condition that made her pregnancy high-risk and was to be monitored and avoided through medical care during the late stages of the pregnancy.

Moreover, plaintiff has alleged and the court has no reservation about plaintiff's ability to prove that bleeding from the vagina during the last trimester of pregnancy "is well known . . . as being a serious medical condition that requires immediate medical attention for the health of the mother and her unborn child. Bleeding during the last trimester is usually associated with placenta previa or placental abruption, both of which are serious medical conditions [and] placental abruption can, when left untreated, cause death to both mother and child, and a range of other life-threating complications." Amended Complaint at ¶ 27. Given the above facts and drawing all reasonable inferences in plaintiff's favor, the subjective component of a deliberate indifference claim adequately has been pled.

Third, plaintiff has alleged that the minor child was alive when plaintiff went into labor at the hospital. The record reflects that the child was moving its limbs and had a heart beat during the birthing process. It clearly was "viable" at 33 weeks, which is just 5 to 7 weeks shy of reaching a full term of gestation. Defendants had adequate notice and reason to anticipate the

eminent arrival of the child in the near future and the potential for late-term complications in plaintiff's  pregnancy.

Fourth, defendants' repeated failures to even examine plaintiff or monitor her child's vital signs after receiving repeated and ongoing requests and plaintiff begging for medical assistance can be interpreted as setting into motion a dangerous and escalating condition that produced a growing likelihood of injury to the child during and after the progression of the condition, which culminated in the birthing process.  The child suffered injuries in the birthing process that caused its death.  In other words, the injuries to mother and child from defendants' course of deliberate indifference were ongoing and resulted in injuries to the child during and after the birthing process, a point in time when the child clearly was a person within the meaning of the Fourteenth Amendment.

Against this backdrop, the moving defendants' invitation to engage in the rigid line drawing required to dismiss the survival and wrongful death components of the civil rights claim is predicated on a dogmatic and outdated view of the law and lacks legal and logical appeal. Their position is divorced from the decades of medical and legal enlightenment that has ensued since Harman was decided in 1982, some six years after Roe v. Wade was handed down.  The child was noted to be 33 weeks in gestation when plaintiff went into labor.  He had progressed to the point where he enjoyed full protection under the multitude of state and federal laws protecting fetuses of such advanced age.  See supra at 20.  Furthermore, the laws of Pennsylvania permit a child who is born alive to sue under the Survival and Wrongful Death Act.  Hudak v. Georgy, 634 A.2d 600, 603 (Pa. 1993) ("Rather, today we are reaffirming the unremarkable proposition that an infant born alive is, without qualification, a person.  Since live birth has always been and should remain a clear line of demarcation, an action for wrongful death and survival can be maintained on behalf of the Hudak triplets.).  And this is so even where the child

"only survives a moment" at birth.  Id. at 602 (citing Amadio v. Levin, 501 A.2d 1085, 1089 (Pa. 1985)).  Thus, the Supreme Court of Pennsylvania repeatedly has rejected the notion that the death of a child immediately following its birth is an event which disqualifies it from personhood and the ability to seek redress under state law.

In short, as noted in Crumpton, the proposition that "infants injured in utero and later born alive simply must bear their federally cognizable afflictions without hope of remedy" reflects at best dubious logic and runs counter to the various remedies Congress contemplated in passing the Civil Rights Act of 1871, from which § 1983 was derived.  Crumpton, 947 F.2d at 1420-21, 1423 n. 6.[9]  We decline moving defendants' invitation to endorse that proposition and will deny their motion on this score.

For the reasons set forth above, the moving defendants' motion to dismiss will be denied. An appropriate order will follow.

Date: September 30, 2014

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Elmer R. Keach, III, Esquire
        D. Aaron Rihn, Esquire
        Scott M. Simon, Esquire
        Stanley A. Winikoff, Esquire
        Andrew F. Szefi, Esquire
        Paul R. Dachille, Esquire

        (Via CM/ECF Electronic Mail)

---

[9] "Congress enacted section 1983 pursuant to its power under section 5 of the Fourteenth Amendment to adopt 'appropriate legislation' to enforce the Fourteenth Amendment." Crumpton, 947 F.2d at 1420 (citing Quern v. Jordan, 440 U.S. 332, 351 n. 3, 355 (1979); and Ngiraingas v. Sanchez, 495 U.S. 182 (1990)).